**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STEVEN R. FARRINGTON<br>42900 CR 125<br>Deer Trail, CO 80105,<br><br>                    Plaintiff,<br>    vs.<br><br>FREEDOM MORTGAGE CORPORATION<br>907 Pleasant Valley Avenue, Suite 3<br>Mount Laurel, NJ 08054,<br>                    Defendant. | NO. |

**COMPLAINT**

**I.     INTRODUCTION**

1. This is an action for damages and other relief brought by a consumer pursuant to the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*. and state tort law.

2. When Plaintiff Steven Farrington's house burned down in December 2014, little could he know that it was only the beginning of a bureaucratic nightmare that continues to this day.

3. Shortly after the fire, and after Mr. Farrington's insurance company paid his loss claim to his mortgage lender, his mortgage loan was sold to Defendant Freedom Mortgage Corp.. Despite being paid, Freedom refused to make disbursements to Mr. Farrington so that he could rebuild his home. Freedom's choice not to honor its contractual obligations to fund the rebuild has caused massive delays, contractors to abandon the job, and has relegated Mr. Farrington to live out of a trailer on his own land, next to his unfinished home.

4. To add insult to injury, Freedom has chosen to report false and negative information to the credit bureaus – misrepresenting that Mr. Farrington is behind on his

mortgage, when he is not. Despite Mr. Farrington's disputes of the reporting, Freedom has chosen to verify it instead of removing it.

## II.   JURISDICTION

5.   Jurisdiction arises under the FCRA, 15 U.S.C. §1681p, and 28 U.S.C. §1337. Jurisdiction over the state law claims arises under 28 U.S.C. § 1367.

6.   Venue is proper in New Jersey pursuant to 28 U.S.C. 1391 because Freedom Mortgage is a New Jersey corporation, whose headquarters is in New Jersey, its witnesses are located in New Jersey, its documents are located in New Jersey, and much of the improper conduct in this case occurred in New Jersey.

## III.   PARTIES

7.   Plaintiff is an individual consumer who resides in Deer Trail, CO.

8.   Defendant Freedom Mortgage Corporation, (hereinafter "FMCC" or "Defendant") is a New Jersey corporation, whose principal place of business and headquarters are 907 Pleasant Valley Avenue, Suite 3, Mount Laurel, NJ 08054.

## IV.   STATEMENT OF CLAIM

*The Mortgage*

9.   In August 2011, Plaintiff took out a personal VA mortgage with Mortgage Investors Corporation, and Plaintiff signed a promissory note and Deed of Trust in connection with the loan.

10.   Mortgage Investors Corporation sold the note and Deed of Trust in the secondary mortgage market to a securitized trust ("The Trust"), whose true identity is unknown, but who will be identified in discovery.

11.   The loan was first serviced by Ocwen, then transferred to FMC.

12. FMC is currently the servicer of the loan.

13. Part of FMC's servicing duties for the Trust include but are not limited to collecting payments, managing escrow, credit reporting, handling incoming calls and correspondence from consumers, and overseeing distribution of insurance proceeds.

*The Fire and Insurance Claim*

14. In or around December 2014, Plaintiff's house burned to the ground.

15. At the time, Plaintiff had insurance with Farmers Insurance, who covered the loss.

16. The Deed of Trust states that the insurance company should make the check payable to the borrower and the mortgage company.

17. Plaintiff signed the insurance check and set it to the previous servicer, Ocwen.

18. Under the Deed of Trust, the Lender generally will allow the borrower to use the insurance money to rebuild the property. However, if the Lender determines that a rebuild was not to be economically feasible, then the insurance proceeds must be applied to the loan.

19. Ocwen gave Plaintiff $95,000 as a "1st draw" to being rebuilding the home. As Ocwen explained to the Plaintiff, the insurance money would be paid in 3 draws, and they would expect to see about 1/3 of the construction completed with each draw.

*Freedom Takes Over, and the Trouble Starts*

20. Unfortunately for Plaintiff, the servicing rights to this loan were transferred from Ocwen to Freedom, and once Freedom got the loan, the nightmare began.

21. Ocwen transferred $189,654.48 of the remaining insurance proceeds to Freedom.

22. In December 2015, Freedom made a note in their servicing notes, that they were going to require Plaintiff to be 90% done with construction with only 1/3 of the money, which is obviously impossible to do.

23. In July 2016, Plaintiff requested that Freedom make the 2nd draw of the insurance money, but Freedom told Plaintiff that it would not do so because the previous servicer, Ocwen, allegedly did not transfer any of the insurance claim documents, estimates, etc., to it upon the servicing transfer, and therefore, Plaintiff would need to go on a scavenger hunt and resubmit every single document.

24. In September 2016, Defendant received the existing insurance claim information from Plaintiff, who also requested that Defendant inspect the property. Defendant said they would do the inspection but cancelled at the last minute because they were allegedly missing the adjustment worksheet.

25. On September 26, 2016, Defendant called Farmers Insurance and asked them to fax in the adjustment worksheet.

26. On October 3, 2016, Defendant received the adjustment worksheet from Farmers.

27. On October 4, 2016, Plaintiff called Defendant and requested that they inspect the property.

28. On October 10, 2016, Defendant called Plaintiff and told him that they would inspect the property on October 11, 2016.

29. On October 11, 2016, Defendant called Plaintiff and told him that they would be canceling the inspection because they didn't have the adjustment worksheet on file, even though their own file showed that Farmer's faxed the adjustment worksheet to them on October 3, 2016.

30. On October 14, 2016, Plaintiff called Defendant to again request another draw, and Defendant told him they couldn't release any money because he would have to be at least 50% completed with the construction, with only 1/3 of the money and Defendant said they had no documents at all, even though this was completely false.

31. On October 17, 2016, Plaintiff called Defendant, and Defendant for the first time stated they would need blueprints/drawing of home, and again the adjuster estimate, even though they had already received all this information. Defendant also told Plaintiff he would have to send them a "Letter Request," whatever that means.

32. On October 19, 2016, Plaintiff became so frustrated, he called Defendant and told them he wanted them to apply the remaining $189,854.48 in insurance money to the principle of the loan.

33. On November 11, 2016, Defendant now demanded that Plaintiff provide a contractor's bid, and a "waiver of lien."

34. In February 2017, Defendant wrote in its servicing notes that it was not missing any documents at all in order to disburse the insurance money.

35. On February 17, 2017, Defendant notified Plaintiff that it would be coming out to inspect the property on February 22, 2017.

36. On February 24, 2017, Defendant falsely documented its file to show that 0% of the repairs had been completed, which was not even close to reality.

37. On March 16, 2017, Defendant wrote in its notes that it had received the contractor's bid, contractor's license, and W9 for the contractor.

38. On March 17, 2017, Defendant wrote that it was ordering another draw in the amount of $10,000. A few hours later, Defendant wrote in its file that it was cancelling the draw.

39. On March 17, 2017, Defendant wrote in its file that it had received the floor plan/blueprints and signed contractor's bid.

40. On March 17, 2017, Plaintiff again called Defendant and requested that it release the next 1/3 draw of the insurance money to continue construction. That same day, Defendant wrote

in their file that their inspection had revealed that 31% of the construction had been completed, and that they would request that the 2nd draw be paid.

*Freedom Still Refuses to Pay*

41. On March 20, 2017, Defendant cancelled payment on the 2nd draw allegedly due to needing "corporate approval", whatever that means.

42. On March 29, 2017, Plaintiff called Defendant to inquire about the status of the 2nd draw, and Defendant told him that his request was still pending and usually takes 7-10 business days.

43. On April 6, 21017, Defendant wrote in the file "we are missing letter of intention to rebuild home, but that **Claim has all other required documentation."**

44. On April 7, 2017, Plaintiff called Defendant to check on the status of the 2nd draw, and Defendant told him it was still pending and to give it another 7-10 business days.

45. On April 12, 2017, Plaintiff called Defendant to check the status of the 2nd draw, and Defendant told him it was still pending and to give it another 7-10 business days.

46. On April 18, 2017, Plaintiff called Defendant to check on the status of the 2nd draw, and Defendant told him it was still pending and to give it another 7-10 business days.

47. On April 19, 2017, Plaintiff called Defendant to check on the status of the 2nd draw, and Defendant told him it was still pending and to give it another 7-10 business days. Plaintiff told Defendant he was in danger of losing his contractor that was rebuilding the property. Defendant said they were still waiting for "corporate approval".

48. On April 25, 2017, Plaintiff called Defendant to check on the status of the 2nd draw, and Defendant told him it still was not approved and that they would have to check with a "specialist" and get back to him.

49. On May 8, 2017, Plaintiff called Defendant to check on the status of the 2nd draw, and Defendant told him they could not help him over the phone and that they'd have to call him back.

50. On May 19, 2017, Defendant finally got back to Plaintiff and said they still had not updates but that they were "following up" on the request.

51. On May 30, 2017, Defendant wrote in its file, that they had brought this matter to the attention of Defendant's in-house counsel, and that borrower was afraid he would lose his contractor due to delays, and that demolition has been completed.

### *Plaintiff Got Tangled in Freedom's Fraudulent, and Bureaucratic Web*

52. Incredibly, on June 29, 2017, Defendant sent Plaintiff a letter saying that they were just writing to check on the status of the rebuild, even though they knew that Plaintiff had been waiting on Defendant to give him a position as to whether the 2nd draw was going to be issued or not. This was an attempt by Defendant to create a fraudulent paper trail to create a false picture that Plaintiff was the one who was not cooperating.

53. On July 5, 2017, Plaintiff called Defendant to check on the status of the 2nd draw and Defendant told him that they could not release anymore funds until he was at least 50% completed with the construction, even though Plaintiff only received 1/3 of the insurance money as the first draw. It remains to be seen how it could be possible to be 50% complete on construction with only 33% of the funds needed. Plaintiff responded that of course there had been no further work done since the February 22, 2017 inspection because he needs the 2nd draw to continue construction.

54. On August 3, 2017, Defendant sent out an inspector, who this time determined that 27% of the construction had been completed with the 1st draw. Defendant's inspector told

Defendant that the work remaining was framing, roof, doors, windows, flooring, exterior, drywall, plumbing, electrical, HVAC, painting and cabinets.

55. On August 30, 2017, Plaintiff called Defendant and told them he was living in a trailer on the property, and wanted to know the status of the 2nd draw.

*More Months Go By, but Still No Disbursal*

56. On January 19, 2018, Defendant called Plaintiff and asked him the status of the rebuild, and Plaintiff told Defendant he cannot rebuild unless they send him a 2nd draw.

## COUNT I

## FAIR CREDIT REPORTING ACT

57. Plaintiff re-alleges and incorporates the above paragraphs as if fully set out herein.

58. In October 2019, Plaintiff discovered that Defendant was reporting a host of false information about him to the Big 3 credit bureaus, Equifax, Experian, and Trans Union. More specifically, Defendant was reporting that Plaintiff was "past due", listing a highly inflated balance amount, an incorrect payment history of 180+ days late and that Plaintiff was not paying as agreed.

59. Defendant has admitted under oath that the only reason their records show Plaintiff as delinquent is because they have not applied the insurance money to the loan. In other words, if Defendant properly applied the insurance proceeds, then the loan would be current, on time, and not past due.

60. On October 24, 2019, Plaintiff disputed the false reporting with the Big 3 credit bureaus, Equifax, Experian, and Trans Union, and specifically said in his letter that the insurance money should have been applied to the loan since Defendant refused to allow him to use the insurance money to rebuild.

61. The Big 3 credit bureaus, Equifax, Experian and Trans Union notified Defendant of Plaintiff's disputes via the e-Oscar system, by sending Defendant and ACDV form, which tells Defendant what the credit bureaus have on file, and asks the Defendant to conduct an investigation into the accuracy of the reporting. As an attachment to the ACDV, the Big 3 credit bureaus, Equifax, Experian and Trans Union also gave Defendant a copy of the Plaintiff's letter as an image/attachment.

62. Defendant willfully and negligently violated 15 U.S.C. 1681s-2(b), by engaging in what is known as a "data conformity review" which consists of an employee simply matching previous false reporting in the computer with current false information in the computer. A classic "garbage in, garbage out" scenario, which consists of a maximum of 3 minutes, and is basically just matching basic information such as name, SSN, DOB, balance, etc.

63. Defendant had the information in its own possession to substantiate Plaintiff's dispute – all Defendant had to do was read the Deed of Trust, and then look at its own notes to make the determination that the insurance money had to be applied to the loan because Defendant had chosen not to allow Plaintiff to rebuild.

64. Defendant's employee(s) charged with performing the so-called "investigation" did not even interview or call anyone, or even read the company's loan file or Deed of Trust. Instead, Defendant treats its investigations under 1681s-2(b) as a factory assembly line where employees are expected to crank out as many as possible each day, the emphasis being on quantity, not quality.

65. Defendant willfully violated 15 U.S.C. 1681s-2(b) by failing to accurately report the results of the investigation – one of the results was that Plaintiff disputed Defendant's credit reporting, and Defendant failed to report to the credit bureaus that Plaintiff disputed the credit

reporting. The way that a data furnisher tells a credit bureau that a consumer disputes the reporting is to report Defendant's action of failing to report that Plaintiff disputed the loan was no accident, and instead was compliance condition code "XB", which translates to "account disputed by consumer." intentional and willful because Defendant has trained its employees to not report loans as disputed when responding to an ACDV. The simple truth is that Defendant does not want to report loans as disputed because the FICO score is not affected as much if the loan is reported as disputed, and it is a basic tenant of debt collection that the way you get people to pay up is to harm their credit score.

66. Defendant falsely certified to Equifax, Experian, and Trans Union, who then notified Plaintiff, that it would not be changing its credit reporting because Defendant had purportedly "verified" the information.

67. Defendant's violations of the FCRA caused Plaintiff actual damages such as emotional distress, embarrassment and humiliation associated with having false information transmitted abut him to various third-party creditors when Plaintiff applied for a loan in December 2019.

**WHEREFORE**, Plaintiff prays for the following relief:

(a) Actual damages to be determined at trial;

(b) Punitive damages to be determined at trial;

(c) Attorney fees and costs; and

(d) For such other further relief as may be proper.

## COUNT II

## BREACH OF CONTRACT

68. Plaintiff re-alleges and incorporates the above paragraphs as if fully set out herein.

69. At all times relevant herein, Plaintiff substantially performed his side of the contract.

70. The Deed of Trust requires Defendant to do one of the following things: 1) allow Plaintiff to use the insurance money to rebuild the property; or 2) if Defendant decides that it would be economically feasible to rebuild the property, or that a rebuild would lessen Defendant's interest, then the insurance money must be applied to the loan.

71. The Deed of Trust gives rise to a fiduciary relationship between Plaintiff and Defendant, as the servicer of Plaintiff's mortgage loan.

72. Defendant has breached the contract by refusing to allow Plaintiff to use the insurance money to rebuild the property, and by refusing to apply the insurance proceeds to the loan.

73. Defendant has simply kept the $189,954 insurance money in its own bank account the entire time.

74. At this point in time, it would no longer be economically feasible to rebuild the property. The costs of construction have increased greatly since the original estimate, and all repairs originally done would have to be redone because it has been exposed to the weather elements for too long. The remaining $189,954 is not enough money to finish the rebuild.

75. Defendant officially breached the contract in July 2017, when it notified Plaintiff that Defendant had determined that it would not allow Plaintiff to rebuild the property or apply the money to the load. Prior to that date, Defendant strung Plaintiff along with its never-ending

requests and excuses, which caused Plaintiff to believe that Defendant eventually going to be performing under the contract.

76.  Defendant owes Plaintiff a liquidated debt of $189,954.

77.  Defendant also added bogus fees for "forced placed insurance" on Plaintiff's loan in September 2017 in the amount of $1,963 to cover the structure of the dwelling, even though there was nothing to insure as the dwelling had burned down, and it is doubtful that the dirt and weeds needed to be insured.  And to the extent the dirt and weeds needed to be insured, $1,963 would be an outrageous premium amount.

78.  On information and belief, Defendant received some type of kick-back or other benefit from force placing insurance, and Plaintiff bases that on the fact that a class action lawsuit was recently filed against Defendant for improperly force placing insurance on their customer's loans.

79.  Defendant's breach of contract in this case was willful, wanton, and malicious. Defendant's motives are either that it is targeting the Plaintiff, willfully mistreating him consistent with a pattern and practice of similar treatment of consumers, or alternatively Defendant just wants to foreclose on the Plaintiff's property at a handsome profit.

80.  Defendant's breach of the contract has also caused Plaintiff other actual damages, including; inconvenience, loss of ability to take out a new loan, thousands of dollars in "default interest" and other junk fees being added to the loan such as "inspection fees" to drive by Plaintiff's land, loss of the benefit of the bargain, and emotional distress – Plaintiff has been living in a trailer on the property for several years now.

    **WHEREFORE**, Plaintiff prays for the following relief:

    (a)  Actual damages to be determined at trial;

    (b)    Punitive damages to be determined at trial;

    (c)    For such other further relief as may be proper.

## COUNT III

## REAL ESTATE SETTLEMENT AND PROCEDURES ACT

81. Plaintiff re-alleges and incorporates the above paragraphs as if fully set out herein.

82. Plaintiff's mortgage loan is a federally related mortgage loan because it is a VA loan incurred for personal, family and/or purposes to purchase Plaintiff's residence.

83. Defendant is the servicer of Plaintiff's mortgage loan.

84. In September 2017, Defendant added forced place insurance to Plaintiff's loan to cover the dwelling in the amount of $1,963. The problem was that there was no dwelling to insure because the residence had burned down.

85. A servicer that charges a borrower for forced place insurance may only do if the charges are bona fide and reasonable. 12 U.S.C. § 2605(m).

86. Defendant's charges of $1,963 were not bona fide or reasonable because there was nothing to insure other than the dirt and weeds, and $1,963 is not a reasonable premium to insure dirt and weeds.

87. Plaintiff seeks actual damages as a result of Defendant's failure to comply with RESPA.

88. Plaintiff also seeks an award of $2,000 in statutory damages pursuant to RESPA for Defendant's pattern and practice of non-compliance.

    **WHEREFORE**, Plaintiff prays for the following relief:

    (a)    Actual damages to be determined at trial;

    (b)    Statutory damages to be determined at trial;

  (c)  Attorney's fees and costs;

  (d)  For such other further relief as may be proper.

## COUNT IV

## BREACH OF GOOD FAITH AND FAIR DEALING

89. Plaintiff re-alleges and incorporates the above paragraphs as if fully set out herein.

90. In Colorado, every contract contains an implied duty of good faith and fair dealing. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995); *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo. App. 1994).

91. The duty of good faith applies when one party has discretion to perform a portion of the contract.

92. Under the contract, Defendant had discretion whether to allow Plaintiff to use the insurance money to rebuild the house.

93. Defendant failed to act in good faith by coming up with capricious, contradictory and arbitrary reasons for refusing to allow Plaintiff to rebuild the residence.

94. To this day, Defendant has never provided anything in writing saying what portion of the construction, if any, it didn't feel was completed, or what else needed to be completed before the next draw could be completed.

95. Defendant set impossible goals to attain such as demanding at various times that Plaintiff be 50% completed with construction with only 1/3 of the insurance funds released.

96. Defendant acted in bad faith by giving Plaintiff a host of excuses and refusing to release any more funds to rebuild on the grounds that it could not obtain "corporate approval" – whatever that is supposed to mean.

97. It was a reasonable expectation on Plaintiff's part that if his house was destroyed, that Defendant would allow him to use the insurance money to rebuild, and at a minimum, that Defendant would provide him with some criteria or description of what would need to happen to release the money.

98. Defendant's breach of the duty of good faith and fair dealing such as loss of use, loss of benefit of the bargain, inconvenience and emotional distress, especially considering that Plaintiff has been continuing to make his mortgage payments, while living in a camper trailer on the property. The trailer is an ice box in the winter, and an oven in the summer, and does not have many of the amenities one would have with a house.

**WHEREFORE**, Plaintiff prays for the following relief:

(a) Actual damages to be determined at trial;

(b) Punitive damages to be determined at trial;

(c) Attorney fees and costs; and

(d) For such other further relief as may be proper.

## COUNT V

## NEW JERSEY CONSUMER FRAUD ACT

99. Plaintiff re-alleges and incorporates the above paragraphs as if fully set out herein.

100. Defendant's performance of the Deed of Trust is subject to the CFA and its implementing regulations.

101. Defendant is subject to the CFA, N.J.S.A. 56:8-1 et seq. and its implementing regulations.

102. The CFA prohibits the use of "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment,

suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person[.]" N.J.S.A. 56:8-2.

103. In the performance of its contractual duties, Defendant engaged in conduct that violates the CFA, N.J.S.A. 56:8-2.

104. As a result of Defendant's unlawful conduct, Plaintiff suffered ascertainable losses.

**WHEREFORE**, Plaintiff demands judgment against Defendant for:

(a) For actual damages;

(b) For treble damages under the Consumer Fraud Act at N.J.S.A.56:8-19;

(c) For reasonable attorneys' fees and costs under the CFA at N.J.S.A.56:8-19 and all other applicable statutes;

(d) For interest; and

(e) For any other relief the Court deems just and proper.

## V. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury as to all issues so triable.

Respectfully submitted:

Date: April 17, 2020

/s/ Andrew M. Milz
CARY L. FLITTER
ANDREW M. MILZ
JODY T. LOPEZ-JACOBS
**FLITTER MILZ, P.C.**
1814 East Route 70, Suite 350
Cherry Hill, NJ 08003
(856) 396-0600

MATTHEW R. OSBORNE
(*Pro hac vice* to be filed)
**MATTHEW R. OSBORNE, PC**
11178 Huron Street, Suite 7
Northglenn, CO 80234
(303) 759-7018
(720) 210-9870 fax