**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| STEVEN R. FARRINGTON, <br><br> Plaintiff, <br><br> v. <br><br> FREEDOM MORTGAGE CORPORATION, <br><br> Defendant. | HONORABLE KAREN M. WILLIAMS <br><br> Civil Action <br><br> No. 20-4432 (KMW-AMD) <br><br> **OPINION** |

Appearances:

Cary L. Flitter, Esquire
Jody Thomas Lopez-Jacobs, Esquire
Andrew M. Milz, Esquire
FLITTER MILZ, P.C.
1814 East Route 70
Suite 350
Cherry Hill, NJ 08003
          Counsel for Plaintiff Steven R. Farrington

Joshua M. Link, Esquire
Dinsmore & Shohi LLP
100 Berwyn Park, Suite 110
850 Cassatt Road
Berwyn, PA 19312
          Counsel for Defendant Freedom Mortgage Corporation

**WILLIAMS**, District Judge:

## OPINION

### I.    INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment ("MSJ") [ECF

No. 86] filed by Defendant Freedom Mortgage Corporation ("Defendant" or "Freedom") in

connection with Plaintiff Steven Farrington's ("Plaintiff" or "Farrington") allegations that

Freedom: (1) violated the Fair Credit Reporting Act ("FCRA"), (2) breached its contract with Plaintiff, (3) violated the Real Estate Settlement and Procedures Act ("RESPA"), (4) breached its duty of good faith and fair dealing, and (5) violated the New Jersey Consumer Fraud Act ("NJCFA").   Also before the Court is the Cross-Motion for Summary Judgment ("Cross-MSJ") [ECF No. 90] filed by Farrington as to the FCRA claim only.   Both Motions are opposed.   For the reasons articulated below, Defendant's MSJ is granted in part and denied in part.   Plaintiff's Cross-MSJ is denied.[1]

## II.    BACKGROUD

### A.    PROCEDURAL HISTORY

On April 17, 2020, Farrington filed a five-count Complaint against Freedom.[2]   Compl., ECF No. 1.   On July 22, 2020, Freedom filed a Motion to Dismiss, which was ultimately denied. Thus, all five Counts remain.   In denying the Motion to Dismiss, Judge Bumb ordered the parties to address why the case should not be transferred to the United States District Court for the District of Colorado.   Order, ECF No. 43, Feb. 25, 2021.   Freedom filed its Answer [ECF No. 49] on March 19, 2021.   Based on the responses from the parties, Judge Bumb declined to transfer the case to the District of Colorado.   Text Order, ECF No. 52, April 21, 2021.   On February 25, 2022, Freedom filed this MSJ and, thereafter, Farrington filed a Cross-MSJ; both Motions are opposed.   These Motions are ripe for disposition.

---

[1]  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

[2]  The causes of action alleged are as follows: (1) Count I: Fair Credit Reporting Act; (2) Count II: Breach of Contract; (3) Count III: Real Estate Settlement and Procedures Act; (4) Count IV: Breach of Good Faith and Fair Dealing; and (5) Count V: New Jersey Consumer Fraud Act.

## B.    FACTUAL BACKGROUND[3]

Farrington is a resident of the state of Colorado (and has been at all times pertinent to this litigation).   SMF ¶ 1.   On August 1, 2011, Farrington obtained a $305,094 mortgage loan ("Note") from Mortgage Investor's Corporation secured by real property known as 42900 County Rd. 125, Deer Trail, CO 80105 ("Property").   SMF ¶ 2.   The Property included approximately 60 acres of land, a home, a large barn, and outbuildings.   SMF ¶ 2.   The Note was a VA loan and secured by a Deed of Trust executed on the same day (Note and Deed of Trust referred to collectively as "mortgage documents").   SMF ¶ 3.   The Note required Farrington to make monthly mortgage payments on the first of every month.   SMF ¶ 4.

The Deed of Trust set forth rights and duties between the parties.   As relevant here, the Deed of Trust provides for how insurance proceeds would be handled in the event of an insurance loss.   SMF ¶ 8.   Specifically, the Deed of Trust states, in pertinent part, [u]nless the Lender and Borrower otherwise agree in writing, any insurance proceeds . . . shall be applied to restoration or

---

[3] For ease of reference, the Court will cite to court documents relating to these motions as follows:
- "Compl." refers to the Complaint [ECF No. 1]
- "MSJ" refers to Freedom's Motion for Summary Judgment [ECF No. 86]
- "Def.'s Br." refers to Freedom's Brief in Support of the Motion for Summary Judgment [ECF No. 86-2]
- "SMF" refers to Freedom's Statement of Material Facts Not in Dispute [ECF No. 86-3]
- "Def.'s Ex. __" refers to Freedom's Exhibits A through T [ECF Nos. 86-4 through 86-20]
- "Cross-MSJ" refers to Farrington's Cross-Motion for Summary Judgment [ECF. No. 90]
- "Pl.'s Opp'n Br." refers to Farrington's Opposition to Freedom's Motion for Summary Judgment and the Memorandum in Support of Farrington's Cross-Motion for Partial Summary Judgment [ECF No. 90-2]
- "RSMF" refers to Farrington's Response to Defendant's Statement of Materials Facts Not in Dispute [ECF No. 90-3]
- "Pl.'s Ex. __" refers to Farrington's Exhibits 1 through 20 [ECF Nos. 90-5 through 90-24]
- "SSMF" refers to Farrington's Supplemental Statement of Materials Facts [ECF No. 90-3]
- "Def.'s Reply Br." refers to Freedom's Reply Brief in Support of its Motion for Summary Judgment and Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment [ECF No. 94]
- "RSSMF" refers to Freedom's Response to Plaintiff's Supplemental Statement of Material Facts [ECF No. 94-5]
- "Def.'s Supp. Ex. __" refers to Freedom's Exhibits A through D [ECF Nos. 94-1 through 94-4]

repair of the Property, if the restoration or repair is economically feasible and Lender's security is

not lessened."   SMF ¶ 9; RSMF ¶ 9.   Moreover, the Deed of Trust provides, "[i]f the restoration

or repair is not economically feasible or Lender's security would be lessened, the insurance

proceeds shall be applied to the sums secured by this Security Instrument . . .."   *Id.*

Additionally, the Deed of Trust outlines how insurance proceeds would be disbursed.   The

precise language of the Deed of Trust provides:

> Unless it is determined pursuant to section 5 that repair or restoration is not
> economically feasible, Borrower shall promptly repair the Property if damaged to
> avoid further deterioration or damage.   If insurance or condemnation proceeds are
> paid in connection with damage to, or the taking of, the Property, Borrower shall be
> responsible for repairing or restoring the Property only if Lender has released
> proceeds for such purposes.   Lender may disburse proceeds for the repairs and
> restoration in a single payment or in a series of progress payments as the work is
> completed.   If the insurance or condemnation proceeds are not sufficient to repair
> or restore the Property, the Borrower is not relieved of Borrower's obligation for the
> completion of such repair or restoration.

SMF ¶¶ 10-12, Ex. C; RSMF ¶¶ 10-12.   The Deed of Trust also states that the Lender is permitted

to hold insurance proceeds until it could inspect the Property to ensure that work has been

completed to the Lender's satisfaction.   SMF ¶ 10.   Finally, the Deed of Trust contains an

express choice of law provision, indicating that it is governed by the law of the jurisdiction in

which the Property is located – here, Colorado.   SMF ¶ 13.

Farrington's loan was a VA loan, thus, the Note provided that regulations issued under the

VA Guaranteed Loan Authority governed the rights, duties, and liabilities of the parties to the loan

and any provisions of the Note which are inconsistent with the regulations are amended and

supplemented to conform to the regulations.[4]   SMF ¶¶ 5, Ex. B.   The Federal National Mortgage

Association ("Fannie Mae" or "FNMA") has a Servicing Guide relating to the disbursement of

insurance proceeds towards the repair of an insured loss, including servicers' responsibilities.

SMF ¶ 14, Def.'s Ex. E; RSMF ¶ 14.   The FNMA Servicing Guide provides, in pertinent part,

that, for insurance proceeds exceeding $40,000, a servicer is authorized to: release an initial

disbursement of 33 percent of insurance loss proceeds and "disburse any remaining funds based on

periodic inspections of the progress of the repair work."   Def.'s Ex. E.

<u>Farrington's Bankruptcy and Subsequent House Fire</u>

On June 25, 2013, Farrington filed for Chapter 13 bankruptcy relief in the U.S. Bankruptcy

Court for the District of Colorado ("Bankruptcy Court").   SMF ¶ 17.   At the time of Farrington's

bankruptcy filing, his mortgage was being serviced by Ocwen Loan Servicing ("Ocwen") and he

had not paid his mortgage in approximately 18 months, owing more than $30,000 in arrearages.

SMF ¶ 18-19.   State-court foreclosure proceedings initiated against Farrington were stayed by the

bankruptcy filing.   SMF ¶ 19.   In December of 2013, the Bankruptcy Court approved a Chapter

13 Plan, which would have ultimately cured all arrears under Farrington's mortgage.   SMF ¶ 20.

In December of 2014, Farrington's home, at the time insured by a homeowner's insurance

policy issued by Farmer's Insurance, was badly damaged by fire.   SMF ¶¶ 21-22.   Farrington

made a claim for this fire loss with Farmer's Insurance; the claim was covered.   SMF ¶¶ 21-23.

Pursuant to the terms and conditions of Farrington's mortgage documents and the homeowner's

---

[4]  Freedom provides that it services VA loans consistent with industry standards set forth in the FNMA Servicing
Guide.   SMF ¶ 14.   However, not only does Freedom fail to provide the Court with the referenced-Exhibit D (the
deposition transcript of T. Tarver), Farrington also denies Freedom's characterization of the referenced-portion of
Tarver's testimony, RSMF 14, Ex. 4; the Court agrees with Farrington that Freedom's characterization misses the
mark.

insurance policy, the insurance proceeds of approximately $283,000 were made payable jointly to Farrington and Ocwen.   SMF ¶ 23.   Ocwen received the insurance proceeds in June of 2015. *Id*.

On June 1, 2015, Farrington sought the Bankruptcy Court's permission to modify his Chapter 13 Bankruptcy Plan so that his mortgage arrearage would not be paid through his Chapter 13 Plan.   SMF ¶ 24; RSMF ¶ 24.   Farrington advised the Court that he wished to "negotiate a settlement with Creditor or the insurance proceeds should satisfy the arrears."   *Id.*   In June of 2015, Farrington unequivocally advised Ocwen that he intended to use the insurance proceeds to rebuild the subject property.   SMF ¶ 25.   In fact, the Plaintiff executed an Intent to Repair form "certify[ing] that the Farmers Insurance loss check…will be used to repair the fire damage that occurred on December 15, 2014 and that the repairs will be made in a workmanlike manner."   *Id.* In June and July of 2015, Farrington, the sole owner of a contracting company, WGID Construction Company, advised Ocwen that his contracting company would complete the necessary repairs to his property.   SMF ¶¶ 26-27.   Farrington provided Ocwen with an executed Contractor Agreement in July of 2015 as both the property owner and the contractor contracting to repair and rebuild the Property for $370,000.   SMF ¶ 28.   The contract provided by Farrington acknowledged that payments would be made in a series of draws.   SMF ¶ 29.   Additionally, Farrington sent correspondence to Ocwen acknowledging that progress payments would be made as opposed to a lump sum payment and reiterating his desire to use the insurance funds to rebuild his home.   SMF ¶ 30.   Specifically, Farrington advised Ocwen that "I need to get started on this as soon as possible as the construction season is well under way at this point so I will require the first draw as soon as possible.   The first phase of construction will necessarily be the demolition

6

and disposal of the ruins." SMF ¶ 31. Farrington and his contracting company also executed an acknowledgement with Ocwen outlining the repair process wherein WGID Construction covenanted "[t]hat each scheduled work phase has been satisfactorily completed in accordance with all applicable Codes and Regulations and the plans and specifications set forth in the Contract before disbursement of payment for such phase is made in accordance with the contract." SMF ¶ 32. Finally, WGID Construction, Farrington's company, executed an Acknowledgement of Payment Procedures acknowledging that (i.) progress payments are released based on inspection results, (ii.) the contracted cost of the project was in excess of the amount of insurance funds held by Ocwen, and (iii.) that the homeowner was responsible for the expenses in excess of the insurance funds held by Ocwen. SMF ¶ 34.

On August 4, 2015, Ocwen released an initial draft, in the amount of $94,977.25, to Farrington and his company to begin repair and reconstruction of Farrington's home, which, as outlined in Farrington's July 10, 2015 letter, would include demolition and disposal of the ruins. SMF ¶¶ 35-36; RSMF ¶ 35-36. Farrington used a portion of the loan proceeds to improve the barn and repair the fencing on the Property, citing the need to place the material securely and keep the livestock out of the foundation. SMF ¶ 37, Ex. A at 47; RSMF ¶ 37. Farrington also used the funds for the demolition of the old structure, well, septic, foundation, ground iron to foundation, excavation, water proofing, driveway, and disposal.[5] SSMF ¶ 6.

Farrington's Loan Transfer to Freedom

---

[5] Freedom denies this fact but fails to cite to record evidence to support the denial.

In November of 2015, the servicing of Farrington's mortgage was transferred from Ocwen to Freedom, and Ocwen provided documents to Freedom relating to Farrington's insurance claim. SMF ¶ 38; SSMF ¶ 9.   After the transfer, the communications between Freedom and Farrington as it relates to disbursement of the second draw of the insurance proceeds were plagued with alleged issues relating to missing documents, varied inspection results of the Property, and Freedom's requests for the status of the repairs of the Property.

First, there were disputes concerning whether Freedom had in its possession all the documents necessary to release the second draw.   By letter dated July 12, 2016, Freedom sent Farrington a letter stating that it had made repeated attempts to contact him and that it had not received any updates within the 90 days related to the status of repairs on the Property.   SMF ¶ 39, Ex. P.   Although Farrington called Freedom to update insurance information on January 7, 2016, SMF ¶ 39; RSMF ¶ 39, in February and April of 2016, Freedom called Farrington but noted that the "call could not be completed as dialed."   SMF ¶ 39; RSMF ¶ 39.   On July 22, 2016, Farrington called Freedom about the second draw of the loan proceeds, however, Freedom advised that no documents were transferred from Ocwen, and it needed Farrington to resubmit all documents.   RSMF ¶ 40.   Thereafter, while the record reflects that claim information was submitted to Freedom, the nature of the claim information and who submitted the same is not clear.[6]   RSMF ¶ 41, Ex. 2; Ex. 4 at 37-38.   On August 3, 2016, Freedom's service notes indicate that an email was sent to Farrington regarding required missing documents.   Pl.'s Ex. 2 at 16.   In

---

[6] Referencing an Exhibit Q, Freedom purports to set forth undisputed facts regarding conversations with Farrington and his failure to provide requested information.   SMF ¶¶ 40-45.   However, Freedom failed to provide the Court with an Exhibit Q – described as pertinent portions of Freedom's servicing notes.   Thus, the Court derives these facts from Farrington's Responsive Statement and exhibits attached thereto.

April of 2017, Freedom advised Farrington that it had all documentation except for a letter of intent.   RSMF ¶ 44.   Farrington provided a letter of intent to Ocwen.   Def.'s Ex. I.

There are similarly disputes concerning Freedom's requests for the status of repairs and differing inspection results obtained by Freedom which continuously delayed the release of the second draw.   With a decision on the second draw still pending, in late 2016, Farrington told Freedom that he wished to have the remainder of the loan funds applied to the unpaid principal balance, however, at other times, he requested disbursement of the additional funds to move forward with construction.   SMF ¶ 43.   From February 2017 through October 2017, Farrington made several requests for the second draw of insurance proceeds and contacted Freedom several times to check the status of said request.[7]   RSMF ¶ 44.   Indeed, a March 20, 2017 draw request was cancelled, and it was determined that Freedom's corporate approval was necessary to approve the draw.   SMF 45; RSMF ¶ 45.   While Freedom states that an inspection revealed that sufficient progress had not been made for the release of second draw, Farrington disputes that Freedom ever told him that there was not sufficient progress.   SMF ¶¶ 44-45; RSMF ¶¶ 44-45. Thereafter, Freedom sent Farrington a letter in June 2017 indicating that it was waiting for a status of repairs while the matter was still pending corporate approval.   Id.   In July of 2017, Farrington advised Freedom that no additional work was performed on the Property since 2016 and a follow-up inspection in August of 2017 confirmed that no additional work had occurred.   SMF ¶ 46.

---

[7] None of the exchanges between Farrington and Freedom between February and October 2017 resulted in the release of the second draw.   RSMF ¶ 44.   Most of the conversations involved Freedom relaying to Farrington that the matter was still pending corporate approval.   Id.   Other conversations involved discussion of inspections.   For instance, conversations in March 2017 revealed that an inspection showed that the Property was 31 percent complete, and that corporate approval was necessary to release the funds.   Id.   Yet, in July of 2017, Freedom ordered a "50 percent inspection" of the property; in August 2017, an inspection determined that the Property was 27 percent complete.   Id.

9

On October 24, 2017, Freedom denied the second draw, citing the need for a letter of intent. SMF ¶ 44.   Freedom cited a missing letter of intent even though Ocwen had one on file since 2015.   SSMF ¶ 25.   Farrington characterizes Freedom's October 2017 decision as a decision not to allow the rebuild; of course, Freedom denies this, maintaining that it never decided not to allow Farrington to rebuild his house and pursuant to the Deed of Trust, the loan proceeds had to be used to fund the rebuild.   SSMF ¶ 27; RSSMF ¶ 27.

The issues surrounding the second draw of insurance proceeds continued into 2018. Farrington's request for the second draw remained.[8]   SMF ¶ 49; RSMF ¶ 49.   On June 26, 2018, Freedom had another inspection performed which indicated that 30 percent of the work was complete.   *Id.*   Tanya Tarver testified that she did not know what specifically these inspections needed to show.   Pl.'s Ex. 4 at 107.

On September 11, 2018, Farrington received a bankruptcy discharge and his Chapter 13 bankruptcy was closed, with Farrington's mortgage, including any alleged arrearage, to be handled outside of the bankruptcy context.[9]   SMF ¶ 50.   There were additional bankruptcy proceedings in October 2018 wherein Farrington alleged that Freedom had not released any insurance proceeds and the misapplication of payments resulting in a purported arrearage.   SMF ¶ 51; RSMF ¶ 51. The adversary proceeding was dismissed for lack of jurisdiction.   Pl.'s Ex. 15.

Freedom's Credit Reporting to Transunion

---

[8]  Apparently, Farrington also requested that Freedom allow him to place a modular home on the property.

[9]  Farrington denies that there was an arrearage claiming that Freedom already decided that it was not going to allow Farrington to rebuild.   Of course, these issues are disputed.

In 2018, Freedom began reporting Farrington's mortgage payment information to the Big 3 credit bureaus.   SMF ¶ 52; RSMF ¶ 52; Def.'s Supp. Ex. A.   In October 2019, Transunion, a consumer reporting agency ("CRA"), notified Freedom that Farrington disputed its credit reporting; the credit report listed that Freedom was reporting him past due $38,736, and with a balance of $285,366.   SSMF ¶ 32; Ex. 8, p.1. 33.   Transunion described Plaintiff's dispute as "[c]onsumer house burned down and an insurance company issued a check to Freedom for the loss, Freedom refuses to apply the money to a rebuild on his property and therefore should apply the insurance money to Freedom [sic]."   SSMF ¶ 34.   Freedom assigned its employee, Angela Flores, to investigate Farrington's dispute and to respond to Transunion.   SSMF ¶ 35.   On November 20, 2019, Ms. Flores, certified to Transunion that the information reported about Farrington was accurate.   SSMF ¶ 36.   Included in the response, Ms. Flores certified for Freedom that the following was "accurate": 1) that Plaintiff was currently 180 days late; 2) that Plaintiff was over $38,000 past due; and 3) that Plaintiff had an outstanding balance of over $284,000.   SSMF ¶ 36.   Ms. Flores does not remember investigating Farrington's disputes nor do the notes show the steps Ms. Flores took to investigate Farrington's dispute.[10]   SSMF ¶¶ 37-39.

Force-placed Insurance[11]

---

[10] Farrington lodged a similar dispute with Experian. SSMF ¶ 47.   Freedom assigned its employee, Juana Cambron, who certified to Experian that the information reported about Plaintiff was accurate.   SSMF ¶ 51.   Ms. Cambron does not remember the discrete steps she took to investigate the dispute; the facts relating to same are disputed by the parties.   SSMF ¶¶ 52-57; RSSMF ¶¶ 52-57.

[11] Here again, Freedom relies on exhibits it failed to provide to the Court.   Farrington objects to paragraphs 47 (citing to Exhibit Q) and 48 (citing to Exhibit D).

Force-placed insurance is the process by which a lender obtains property insurance for the borrower.   SSMF ¶ 81, Ex. 4.   The Deed of Trust requires that the Borrower maintain property insurance for the Property.   SMF ¶ 6.   Specifically, the Deed of Trust requires that "Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire…and any other hazards…" SMF ¶ 6.   The Deed of Trust also contains provisions permitting the mortgagee to obtain force-placed insurance coverage if the Borrower fails to maintain coverage.   SMF ¶ 7.   In 2017, Freedom force-placed insurance on Farrington's loan in the amount of $1,963.   SSMF ¶ 83, Ex. 4.   In 2018, Freedom force-placed insurance on Farrington's loan in the amount of $2,002.   SSMF ¶ 84.   Freedom took out $300,000 in force-placed insurance although Farrington's home had been burnt to the ground and no longer existed. SSMF ¶ 86.

The force-placed insurance policy ("Policy") provided $300,000 in coverage protection for the dwelling under Coverage A.   Pl.'s Ex. 12.   Coverage B protected "Other Structures" at ten percent of Coverage A.   *Id.*   The Policy defines "dwelling" as "[a] building designed for use as a residence for no more than four families or a mobile home."   Pl.'s Ex. 12.   Further, the Policy defines "mobile home" as "[a] building which satisfies the National Mobile Homes Construction and Safety Standards, as presently existing or hereafter amended, or the American Society of Civil Engineers Standard ANSI/ASCE 7-88."   *Id.*   Farrington describes the conditions of the trailer as an icebox in the winter and an oven in the summer; Farrington had to haul water and gas for the trailer; his wife would not live with him due to the condition of the trailer; and Farrington was

forced to shower at work due to the living situation in the trailer.[12]   Pl.'s Supp. SMF ¶ 80.
Farrington maintains that there was no dwelling to provide coverage for; while Freedom states that
the policy could have potentially covered the mobile home as well as the barn, outbuildings, and
construction materials/equipment on the Property.   SSMF ¶ 86-89; Def.'s RSMF ¶¶ 86-89.

## III.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as
to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the
outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416
(3d Cir. 2015)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by
& through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020)("A fact is
material if—taken as true—it would affect the outcome of the case under governing law.").
Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict
for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the
absence of a genuine issue of material fact.   *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,
323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come
forward with 'specific facts showing that there is a *genuine issue for trial*.'"" *Id*. (quoting
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion
for summary judgment, the nonmoving party must identify specific facts and affirmative evidence

---

[12]   While Freedom denies the allegations in this paragraph, it fails to set forth a citation supporting its counter
statements.   *See* L. Civ. R. 56.1 (requiring that a statement containing disagreements to state the material fact in
dispute and cite to affidavits or other documents submitted in connection with the motion).

that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

The above-articulated governing standard remains the same when courts are presented with cross-motions for summary judgment. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016). "When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.* at 402 (quoting 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2720 (3d ed. 2016)).

## IV. DISCUSSION

### A. New Jersey Consumer Fraud Act (Count V)

Before addressing the substance of Farrington's NJCFA claim, Freedom first argues that because the Deed of Trust dictates that Colorado law governs the parties' relationship, Farrington's NJCFA claim is barred by contractual and common law choice of law principles. Def.'s Br., ECF No. 86-2, 14-22. Farrington argues that Freedom waived the choice-of-law affirmative defense through its failure to raise same prior to summary judgment. Pl.'s Opp'n Br., ECF No. 90-2, 5-7. Farrington argues that Freedom failed to raise a choice-of-law argument in its Motion to Dismiss the NJCFA claim, in its Answer, or during the 15-month discovery period, which included

discovery on the NJCFA claim.   *Id.*   Thus, Farrington argues that he would be prejudiced by this belated choice-of-law argument since discovery has ended and he would now be precluded from pursuing discovery to support a consumer fraud claim under Colorado law.   *Id.*   In its Reply, Freedom argues that Farrington cannot claim surprise that Colorado, as opposed to New Jersey, law applies because Farrington cites to Colorado law in his Complaint and Freedom preserved its choice-of-law defense in its Answer by way of its Eleventh and Sixteenth Affirmative Defenses. Def.'s Reply 4.   Freedom also contends that it clearly and unequivocally denied that the New Jersey Consumer Fraud Act applied to the parties' relationship.   *Id.*

Parties may waive choice-of-law issues if they are not raised in a timely fashion.   *Safarian v. Am. DG Energy Inc.*, No. 10-6082, 2015 WL 12698441, at *6 (D.N.J. Nov. 24, 2015), *aff'd*, 729 F. App'x 168 (3d Cir. 2018)(citing *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316 (3d Cir. 2014)); *see, e.g., Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC,* No. 13-4663, 2019 WL 13182410, at *1 (E.D. Pa. Nov. 8, 2019)(noting that a party's litigation conduct can constitute waiver of choice-of-law issues and declining to consider choice-of-law principles at the motion *in limine* stage).   "Rather than setting a firm end point at any specific stage of the litigation, the Third Circuit has held that whether an affirmative defense is waived will depend on whether the defense was raised 'at a pragmatically sufficient time' and whether the plaintiff was prejudiced in his ability to respond."   *Safarian*, 2015 WL 12698441, at *6.

Here, based on the prejudice to Farrington, Freedom has waived the ability to raise a choice-of-law argument.   Freedom filed a Motion to Dismiss Farrington's NJCFA claim but remarkably failed to argue dismissal based on choice-of-law principles.   Judge Bumb denied that Motion, finding Farrington adequately pled a NJCFA claim.   While Freedom's Answer generally

15

denies that "Plaintiff and the Deed of Trust are protected by the CFA," preserved "rights and privileges in the Deed of Trust," and stated that Plaintiff's claims are barred based on the terms, conditions, or other provisions of the applicable agreements between the parties, Freedom, after filing a dispositive motion that failed to raise choice of law, also fails to specifically raise the matter in its Answer.   Thereafter, the parties engaged in more than a year of discovery on Farrington's claims, including the NJCFA claim.   Thus, based on the specific set of facts and circumstances presented here, Farrington would be prejudiced as the choice-of-law issue was never, even though it could have been, squarely raised before this stage of litigation. Significantly, the parties engaged in discovery, with the attendant time, effort, and expense relating to same, on the NJCFA claim.   As such, this Court finds that Freedom has waived any choice-of-law defense as to the NJCFA claim.

Next, Freedom fails to show that there is no genuine dispute as to any material fact relating to the NJCFA claim.   The NJCFA prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . .

N.J.S.A. § 56:8-2.   To state a claim under the NJCFA, a plaintiff shall allege: "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009); *see also Frederico v. Home Depot*, 507

16

F.3d 188, 202 (3d Cir. 2007)(citing *Cox v. Sears Roebuck & Co*., 138 N.J. 2, 647 A.2d 454,

462–465 (1994)("a plaintiff must allege that the defendant engaged in an unlawful practice

that caused an ascertainable loss to the plaintiff.").

      Freedom contends that Farrington cannot show that it engaged in unlawful conduct

in connection with the sale or advertisement of any merchandise or real estate.   To the

contrary, the NJCFA does not limit liability to only unlawful conduct in connection with

the sale or advertisement of real estate, but also encompasses conduct relating to the

subsequent performance of same.   N.J.S.A. § 56:8-2.   The record before the Court is

littered with factual disputes concerning alleged unconscionable and deceptive practices

relating to Freedom's performance that a reasonable jury could find constitute behavior

falling outside of the norm of reasonable business practice.   For example, Freedom's

refusal for more than two years to disburse a second draw of the insurance proceeds

(Ocwen having disbursed the first draw of the insurance proceeds) for the rebuild of

Farrington's home (i.e., varying inspection results and lack of clarity about what the

inspection results needed to provide to allow for disbursement of insurance proceeds; and

Freedom's alleged lack of documents relating to the rebuild after assuming the loan from

Ocwen and using the lack of documentation as an alleged reason to hold the insurance

funds).   Similarly, for the reasons provided *infra*, there is a genuine dispute as to material

facts concerning whether Freedom's actions relating to the placement of force-placed

insurance were bona fide and reasonable (specifically, whether the Policy was purchased to

cover a dwelling that no longer existed).   Summary judgment as to the NJCFA claim is

denied.

**B.**      **Breach of Contract (Count II)/Breach of the Implied Duty of Good Faith and Fair Dealing (Count IV)**

Freedom argues that Farrington's contractual claims fail because it has been more than

three years since the alleged breach and, thus, under Colorado law, the claims are time-barred.

Def.'s Br. 27-28.    Freedom contends that the latest breach alleged by Farrington occurred on

March 20, 2017, three years and one month before Farrington initiated this lawsuit, when Freedom

allegedly advised Farrington, in bad faith, that corporate approval was needed to release the

insurance funds to Farrington.    *Id.* at 28.    Farrington argues that because Freedom had a

continuing duty to perform, a new claim accrues for each separate breach.    Pl.'s Opp'n Br. 11.

Therefore, Farrington contends that Freedom's breach, failing to apply the insurance proceeds to

Farrington's mortgage balance, continued until September 2020 and therefore, he is entitled to

assert a claim for damages from the date of the first breach within the statute of limitations.    *Id.*

Freedom did not reply to Farrington's argument concerning Freedom's alleged continuing

violations.

Under Colorado law, contract actions shall be commenced within three years after the

cause of action accrues.    Colo. Rev. Stat. Ann. § 13-80-101(1)(a)(West).    "A cause of action for

breach of any express or implied contract 'shall be considered to accrue on the date the breach is

discovered or should have been discovered by the exercise of reasonable diligence.'"

*Neuromonitoring Assocs. v. Centura Health Corp.*, 2012 COA 136, ¶ 26, 351 P.3d 486, 491 (Colo.

App. 2012)(quoting Colo. Rev. Stat. Ann. § 13–80–108(6)).    However, where there is a

continuing contractual obligation coupled with repeated, successive breaches, "'a new claim

accrues for each separate breach' and the plaintiff 'may assert a claim for damages from the date of

18

the first breach within the period of limitation.'"   *Id.* at ¶ 36; 492.   Here, the Court finds that

Farrington's contractual claims are not time barred because Farrington raises facts establishing that

by April 19, 2017 – three years before this lawsuit was initiated on April 17, 2020 – he was still

awaiting corporate's decision about whether the second draw of the insurance proceeds would be

disbursed.   RSMF ¶ 44h.   Indeed, Farrington cites to record evidence indicating that Freedom

advised him on April 19, 2017, that a decision from corporate was still pending about

disbursement of the insurance proceeds and a decision would take about 7 days.   RSMF ¶ 44i.

Freedom's failure to ultimately disburse the insurance proceeds is the very conduct complained of

as it relates to the contract claims.   Thus, Farrington has properly rebutted Freedom's contention

that the last alleged breached occurred on March 20, 2017.   Farrington's contract claims are not

time barred.

### C.   Real Estate Settlement and Procedures Act (Count III)

Count IV of the Complaint asserts that Freedom's charges for force-placed insurance were

not bona fide or reasonable, in accordance with 12 U.S.C. § 2605(m), because there was no

dwelling to insure because it burned down.   Compl. ¶ 84-86.   Freedom argues that Farrington

fails to meet his burden establishing that Freedom violated RESPA due to Farrington's failure to

produce any evidence that the force-placed insurance was not bona fide or reasonable because

contrary to Farrington's assertion that there was nothing more than "dirt and weeds" left on the

Property, there was a large barn and outbuildings on the property.   Def.'s Br. 29-31.   Moreover,

Freedom contends that Plaintiff fails to present expert testimony regarding the reasonableness of

the insurance rates or pointing to other insurance that was available.   *Id.* at 31.   In Opposition,

Farrington, attaching the Policy, acknowledges that a foundation, fence, and barn existed on the

19

property, but contends that these items were excluded from the Policy.   Pl.'s Opp'n Br. at 15.
Farrington contends that instead, Freedom took out $300,000 in coverage on a non-existent
dwelling and continued the Policy from 2017 through 2022.   *Id.*   For the first time, in its Reply,
Freedom proffers that the dwelling covered by the Policy was the "mobile home" that Farrington
placed on the Property, which is a dwelling for purposes of the Policy.   Def.'s Reply at 8-9.
Freedom also contends that the barn was also covered by the Policy.   *Id.*

      All charges related to force-placed insurance imposed on the borrower by or through the
servicer shall be bona fide and reasonable.   12 U.S.C. § 2605(m).   "A bona fide and reasonable
charge is a charge for a service actually performed that bears a reasonable relationship to the
servicer's cost of providing the service, and is not otherwise prohibited by applicable law."   12
C.F.R. 1024.37(2)(h)(2).   "A plaintiff bringing a § 2605 claim must sufficiently allege one of two
types of damages: (1) 'actual damages to the borrower as a result of the failure' to comply with §
2605; or (2) statutory damages 'in the case of a pattern or practice of noncompliance with the
requirements' of § 2605.'"   *Gorbaty v. Wells Fargo Bank, N.A.*, No. 10-CV-3291, 2012 WL
1372260, at *5 (E.D.N.Y. Apr. 18, 2012)(quoting 12 U.S.C. § 2605(f)).   "A plaintiff seeking
actual damages under § 2605 must allege that the damages were proximately caused by the
defendant's violation of RESPA."   *Id.* (the case also discusses pattern and practice).   To
successfully obtain statutory damages, a plaintiff must show "'a pattern or practice of
noncompliance with the requirements' of § 2605."   *Id.*   Essentially, a plaintiff must demonstrate
a defendant routinely operates in this way or point to a wide-ranging, institutionalized practice.
*Id.*

Freedom fails to meet its initial burden by identifying portions of the record that establish the absence of a genuine issue of material fact as to whether its placement of the force-placed insurance was bona fide and reasonable.   While Freedom contends for the first time in its Reply Brief that the mobile home placed by Farrington on the Property was the dwelling covered by the Policy, Freedom did not provide the Policy as an exhibit and failed to even raise the mobile home in its moving brief.   Farrington, citing to, and providing the Court with, the Policy, disputes that there was any dwelling covered by the Policy.   A plain reading of the Policy allowed for the most coverage for the dwelling -- $300,000 of coverage for the dwelling pursuant to Coverage A.   Pl.'s Ex. 12.   Coverage B protected "Other Structures" at ten percent of Coverage A.   While the Policy specially provides that a "mobile home" can constitute a "dwelling," the Policy defines "mobile home" as "[a] building which satisfies the National Mobile Homes Construction and Safety Standards, as presently existing or hereafter amended, or the American Society of Civil Engineers Standard ANSI/ASCE 7-88."   Pl.'s Ex. 12.   The Court has not been presented with evidence demonstrating that the mobile home on Farrington's Property met this standard and was indeed covered by the Policy.   Farrington, citing to the Policy, maintains that there was no dwelling covered by the Policy.   Indeed, as to the "mobile home," Farrington refers to it as a "trailer" and describes the conditions of the trailer as follows: it is an icebox in the winter and an oven in the summer; Farrington had to haul water and gas for the trailer; his wife would not live with him due to the condition of the trailer; and Farrington was forced to shower at work due to the living situation in the trailer.[13]   SSMF ¶ 80.

---

[13]  While Freedom denies the allegations in this paragraph, it fails to set forth a citation supporting its counter statements.   *See* L. Civ. R. 56.1 (requiring that a statement containing disagreements to state the material fact in dispute and cite to affidavits or other documents submitted in connection with the motion).

The facts presented here are distinguishable from the *Iaffaldano* case, cited by Freedom, for one key reason: in that case, plaintiff took issue with the unreasonableness of the force-placed insurance premium, while here, Farrington's allegation is that the Policy was unreasonable and not bona fide because there was no dwelling to protect.   *See Iaffaldano v. Sun W. Mortg. Co., Inc.*, No. 2:17-CV-14222, 2018 WL 2221872, at *1 (S.D. Fla. Feb. 21, 2018).   There exists a material dispute as to the dwelling covered by the Policy and whether the trailer or mobile home constituted a dwelling or not is crucial to the issue of whether the insurance was bona fide and reasonable. Summary judgment is denied.

### D.      FCRA (Count I)

In the Complaint, Farrington asserts that Freedom violated 15 U.S.C. 1681s-2(b) by reporting inaccurate information to the "Big 3" credit bureaus, performing an insufficient investigation after Farrington disputed the reporting, and by failing to accurately report the results of the investigation.   Compl. ¶¶ 58-67.   Freedom seeks summary judgment on the FCRA claim on the premise that, as a matter of law, Farrington cannot establish, as a threshold matter necessary to sustain a FCRA claim, that Freedom's reporting was inaccurate or misleading.   Def.'s Br. 33. Accordingly, the Court should not even reach the reasonableness of Freedom's investigation.   *Id.* In response, Farrington, having filed a cross-motion seeking summary judgment on this issue, argues that Freedom reported inaccurate information claiming that Freedom would not let him rebuild his home and, thus, the insurance proceeds should have been applied to the mortgage balance.   Pl.'s Opp'n Br. 21-22.   Farrington contends that Freedom's application of the insurance proceeds to his loan balance would have rendered the account current, with a lower account balance.   *Id.*   Alternatively, Farrington argues that the information reported by Freedom

22

was misleading because it could have used a certain compliance condition codes to indicate that an insurance payment could have been used toward the mortgage balance or that Farrington was disputing the reporting.   *Id.* at 22-23.   Before addressing the reasonableness of the investigation, the Court will resolve the threshold issue of accuracy first.

The FCRA governs consumer credit reporting and "'was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner.'"   *Seamans v. Temple Univ.*, 744 F.3d 853, 860 (3d Cir. 2014)(quoting *Cortez v. Trans Union, LLC,* 617 F.3d 688, 706 (3d Cir. 2010)).   As such, the FCRA imposes a myriad of obligations on CRAs and furnishers of credit information, like banks.   *Id.*

Section 1681s-2(a), outlining the duties of furnishers, prohibits furnishers from providing information to a consumer reporting agency which it has reasonable cause to believe is inaccurate. 15 U.S.C. § 1681s-2(a)(1)(A).   However, the Third Circuit explained that the FCRA precludes privates suits for violations of § 1681s-2(a), leaving enforcement of that provision to federal and state officials.   *Seamans*, 744 F.3d at 864.   A private suit may only be initiated after the furnisher is notified by a CRA of a consumer dispute concerning the accuracy or completeness of the information provided to a CRA by the furnisher.   *Id.*; 15 U.S.C. § 1681s-2(b).

The furnisher's receipt of a dispute triggers its duty to reasonably investigate to ensure the completeness and accuracy of the information furnished.   *SimmsParris v. Countrywide Fin. Corp.*, 652 F.3d 355, 357 (3d Cir. 2011).   Specifically, a furnisher must, in pertinent part: 1) investigate the disputed information; 2) review all relevant information from the CRA; 3) report the results of the investigation to the CRA; 4) if inaccurate or incomplete information is

uncovered, report those results to all CRAs.    15 U.S.C. § 1681s-2(b).    The furnishers

investigation must be reasonable.    The Third Circuit held, like CRAs, furnishers must follow

reasonable procedures concerning the accuracy of consumer data under the FCRA; "a reasonable

procedure is one 'that a reasonably prudent person would undertake under the circumstances.'"

*Seamans*, 744 F.3d at 864 (quoting *Cortez,* 617 F.3d at 709).    The issue of reasonableness is a

"question for trial unless the reasonableness or unreasonableness of the procedures is beyond

question."    *Id.* at 864-65.    Yet, the reasonableness of a furnisher's investigative procedures

should be evaluated based on the content of the notice of dispute sent by the CRA.    *Id.* at 865.

A plaintiff must show inaccuracy to state a claim under § 1681s-2(b).    *Esperance v.*

*Diamond Resorts*, No. 1:18-CV-10237, 2022 WL 1718039, at *5 (D.N.J. May 27, 2022).    A

showing of inaccuracy is required to establish an entitlement to actual damages.    *Id.*    Factually

incorrect information is inaccurate and technically correct information is inaccurate "if, through

omission, it 'create[s] a materially misleading impression.'"    *Seamans*, 744 F.3d at 865.

Whether information is technically inaccurate is generally a question for the jury.    *Id.*

Farrington's FCRA claim fails and Freedom is entitled to summary judgment because there

is no genuine dispute as to any material fact establishing that the information furnished by

Freedom to the CRAs was factually inaccurate or misleading.    Courts have found that a plaintiff

must show a factual inaccuracy in the furnisher's report to a CRA, not the existence of a disputed

legal issue.    *Esperance*, 2022 WL 1718039, at *5 (referencing the First Circuit's pronouncement

that "a plaintiff's required showing [under § 1681–2(b)] is factual inaccuracy rather than the

existence of disputed legal questions")(quoting *Chiang v. Verizon New England*, 595 F.3d 26, 35

(1st Cir. 2010)); *Hopkins v. I.C. Sys., Inc.*, No. CV 18-2063, 2020 WL 2557134, at *7 (E.D. Pa.

May 20, 2020)(the furnished information must stem from a factual inaccuracy, not a legal one).

"'[F]urnishers are neither qualified nor obligated to resolve matters that turn on questions that can

only be resolved by a court of law.'" *Esperance*, 2022 WL 1718039, at *5.

Here, Farrington contests whether, at the time of the reporting, Freedom should have

applied the insurance proceeds to the mortgage balance which would have rendered Freedom's

reporting inaccurate.   After Farrington's bankruptcy proceedings concluded, Freedom reported

Farrington's loan balance and over $30,000 in arrears to the CRAs.   It is undisputed that Freedom

was holding about $189,000 in insurance proceeds to be used for the rebuild of Farrington's home.

It is also undisputed that if the $189,000 were applied to Farrington's loan, the figures reported to

the CRAs would have been lower.   However, there is no evidence before the Court establishing

that Freedom had an obligation to apply the insurance proceeds to Farrington's loan balance at the

time it furnished the information to the CRAs – indeed, that appears to be a legal issue and

furnishers are not required to resolve the legal validity of a debt prior to reporting to CRAs.

In support of its claim, Farrington points the Court to record evidence purportedly

establishing that "[o]nce Defendant decided in October 2017 that it was not going to allow Plaintiff

to rebuild the house, Defendant was required by the Deed of Trust to apply the insurance to

Plaintiff's loan."   SSMF ¶ 27, Def.'s Ex. C; RSMF ¶ 50.   This statement, however,

mischaracterizes the record evidence.   Freedom did in fact deny Farrington's request for the

second draw on October 24, 2017, but it also cited the need for a letter of intent.   Farrington does

not direct the Court to any evidence demonstrating that Freedom also represented it was no longer

going to allow the rebuild.   Indeed, Farrington continued to request the second draw after the

October 2017 decision and Freedom and Farrington continued to go through inspections and

25

another round of corporate approval, whether this was reasonable or not is simply not relevant to the analysis of this claim.

Second, Farrington's reference to the Deed of Trust fails to inject genuine issues of fact concerning Freedom's obligation to apply the insurance proceeds to the mortgage balance at the time it furnished the information to the CRAs.   The Deed of Trust provides, in pertinent part, [u]nless the Lender and Borrower otherwise agree in writing, any insurance proceeds . . . shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened."   Def.'s Ex. C, p. 4 ¶ 5.   Further, the Deed of Trust provides, "[i]f the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument . . .."   *Id.*   The Court has not been presented with any evidence of the parties' agreement in writing to utilize the insurance proceeds for a purpose other than the restoration or repair of Farrington's home.   There is no evidence before the Court demonstrating that the Deed of Trust allows one party to the agreement to dictate when the insurance proceeds would be utilized for the loan balance as opposed to the rebuild.   Similarly, there is no evidence establishing when, pursuant to the Deed of Trust, a determination concerning the continued economic feasibility of a rebuild should occur.   Frankly, in light of the Deed of Trust and the parties' disputes about the rebuild, these determinations, concerning the applicability and construction of the Deed of Trust as it relates to the insurance proceeds and the utilization of same, appear more appropriate for a court of law.   *Esperance*, 2022 WL 1718039, at *5 (finding "that the validity of Plaintiffs' debt to Diamond Resorts vis-à-vis the Deed-in-Lieu is a legal dispute rather than a factual one."). Indeed, Farrington contends that the insurance proceeds, if applied, would have reduced the

26

amount he owed; he does not, however, dispute that he owed and was in arrears for the amount reported by Freedom.    The Court is constrained by the case law on this issue – a furnisher is not obligated to resolve issues of law prior to reporting otherwise factual information.

Farrington's citation to the Ninth Circuit case, *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1251 (9th Cir. 2022), which is not binding on this Court, does not change the Court's analysis because it is distinguishable from the facts presented here.    *Gross* concerned a dispute over the accuracy and investigation of defendant's (the holder of the junior mortgage) reports to the CRAs of a mortgage balance, late fees, and interests, following the foreclosure and trustee sale of plaintiff's home, the proceeds of which did not cover the junior mortgage.    *Gross*, 33 F.4th 1246. Central to the issue was an Arizona Anti-Deficiency Statute, which abolished plaintiff's liability for the mortgage debt as it provided that "no action may be maintained to recover any difference between the amount obtained by sale and the amount of the indebtedness ....".    *Gross*, 33 F.4th at 1251.    As to the issue of the accuracy of the reporting, the Ninth Circuit found that pursuant to the Anti-Deficiency Statute, plaintiff no longer had an obligation to pay the debt and, thus, there was no balance or any loan to accrue interest or last fees.    *Id.*    Thus, it was patently incorrect for defendant to report otherwise.    *Id.*    The Ninth Circuit likened the plaintiff's situation to the discharge of a debt following bankruptcy as the plaintiff was absolved of all personal liability for the debt based on the statute.    *Id.*    Here, unlike *Gross*, there is no evidence that Farrington's mortgage debt was abolished or discharged due to discharge or a statute requiring same. Moreover, while the Deed of Trust provides the ability for insurance proceeds to be applied to the mortgage balance, there is no evidence before the Court establishing that such a determination had been made – specifically, a determination that the restoration or repair was no longer economically

27

feasible or that the Lender's security would be lessened so as warrant application of the insurance proceeds to the sums secured by the Security Instrument.[14]

To be clear, the Court's findings on this issue do not in any way address the appropriateness of Freedom's actions in deciding whether or not to release the insurance proceeds for rebuild – the Court merely finds no genuine issue of material fact as to the accuracy of Freedom's reporting to the CRAs.   Farrington cannot sustain a claim under § 1681s-2(b) of the FCRA.[15][16]

## V.   CONCLUSION

For the reasons set forth above, the Court grants Freedom's Motion for Summary Judgment as to the FCRA claim (Count I).   The Court denies Freedom's Motion for Summary Judgment as to the contract, RESPA, and NJCFA claims (Counts II, III, IV and V).   The Court denies

---

[14]  Relatedly, this also defeats any argument relating to the Compliance Condition Codes.   It is undisputed that the "AB" code applies when a debt is being paid through insurance.   Def.'s Supp. Ex. C, 2019 Credit Reporting Resource Guide.   As stated above, there had been no determination that the mortgage balance was to be paid through insurance.   Similarly, a plain reading of codes "XB" and "XC" demonstrate that they do not apply.   As to the XB code, the Credit Report Resource Guide provides that it applies when account information has been disputed by the consumer directly to the data furnisher also states "[c]ode XB should no longer be reported after the investigation is complete".   Here, Freedom reported the information to the CRAs, Farrington filed a dispute with the CRA, the CRA advised Freedom of the dispute, and Freedom in turn "investigated," determined the accuracy of same, and then reported back to the CRA.   Thus, Farrington did not dispute the information directly to Freedom and the XB code would have been irrelevant to Freedom's report back to the CRA because the investigation was complete.   Regarding the "XC" code, the Credit Report Resource Guide provides that the code is to be "[r]eported when the investigation of an FCRA dispute made by the consumer directly to the data furnisher has been completed by the data furnisher."   Here again, Farrington filed his dispute with the CRA, not Freedom, the credit furnisher.

[15]  Conversely, Farrington's Cross-Motion seeking summary judgment is denied as moot.   Even if it were not moot, Farrington's Cross-Motion seeking summary judgment rests on the same facts offered in response to Freedom's MSJ. Accordingly, for the reasons set forth above, Farrington fails to point the Court to portions of the record that establish the absence of a genuine issue of material fact.   The Court has found that the dispute concerning whether the insurance proceeds should have been applied to the mortgage balance was a legal, not a factual, dispute that did not impact that factual accuracy of the information reported by Freedom to the CRA.   Thus, Farrington cannot sustain his burden.

[16]  Based on this finding, the Court cannot consider the reasonableness of Freedom's investigation and, while the Court reviewed all record evidence, a recitation of facts relating to the investigation is unnecessary.

Farrington's Cross-Motion for Summary Judgment as to the FCRA claim.    An accompanying

Order will be entered.


Dated: October 31, 2022

KAREN M. WILLIAMS
United States District Judge