UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| STEVEN R. FARRINGTON,<br><br>Plaintiff,<br><br>v.<br><br>FREEDOM MORTGAGE CORPORATION,<br><br>Defendant. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br>No. 20-4432 KMW-AMD<br><br>**MEMORANDUM OPINION** |

**WILLIAMS, District Judge:**

After a five-day trial, a jury found Defendant Freedom Mortgage Corporation ("Defendant") liable for breach of contract, its duty of good faith and fair dealing, and for violations of New Jersey's Consumer Fraud Act ("CFA") and the Real Estate Settlement Procedures Act ("RESPA"). Defendant now moves for judgment as a matter of law or in the alternative, to alter or amend judgment and/or for a new trial ("Motion") (ECF No. 196). Plaintiff Steven R. Farrington ("Plaintiff") opposed the Motion (ECF No. 205), Defendant replied thereto (ECF No. 210), and the Court granted leave for Plaintiff to file a sur-reply (ECF Nos. 211, 212). For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion.

The Court detailed the factual background of the dispute between the Parties which led to the jury trial associated with the instant Motion in an Opinion entered on October 31, 2022. (ECF No. 101) Accordingly, this Memorandum Opinion and Order will focus on the details pertinent to the pending Motion. Plaintiff initiated this action, alleging Defendant 1) breached its contract with Plaintiff; 2) breached its duty of good faith and fair dealing; 3) violated the CFA; 4) violated

1

RESPA; and 5) violated the Fair Credit Reporting Act (the "FCRA").[1] The jury awarded $500,000 on Plaintiff's breach of contract claim, $1,000,000 on Plaintiff's CFA claim, and $20,000 on Plaintiff's RESPA claim. (ECF No. 181) The total damages award Plaintiff was $3,522,000, to include treble damages on Plaintiff's CFA claim. *See* N.J.S.A. 56:8-19. (ECF No. 183) Pursuant to Federal Rules of Civil Procedure 50 and 59, Defendant now moves for judgment as a matter of law, or, in the alternative, to alter or amend the judgment and/or for a new trial. In its Motion, Defendant argues, in the alternative, a request for remittitur on the damages the jury awarded on Plaintiff's breach of contract and CFA claims.

Federal Rule of Civil Procedure Rule 59(e) governs a motion to alter or amend judgment and allows a party to file a motion for reconsideration. Fed. R. Civ. P. 59(e); *Norman v. Elkin*, 849 F. Supp. 2d 418, 421 (D. Del. 2012). A motion for remittitur is essentially a motion for reconsideration, and, accordingly, may only be granted under limited circumstances. *Nelson v. Long Reef Condo. Homeowners Ass'n*, No. 2011-0051, 2017 WL 1823040, at *3 (D.V.I. May 5, 2017. "[A] judgment may be altered or amended if the party seeking reconsideration shows at least one of the following grounds: (1) an intervening change in the controlling law; (2) the availability of new evidence [not available previously]; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice." *Max's Seafood Café, by Lou-Ann, Inc., v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999); *see also N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995).

"The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive."

---

[1] This Court granted summary judgment on Plaintiff's FCRA claim. (*See* ECF No. 101 at 28)

*Spence v. Bd. of Ed. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986). Notwithstanding a jury's award, a district court may, in its discretion, use its remittitur power to reduce that award. *See Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 354 (3d Cir. 2001); *Hayes v. Cha*, 338 F. Supp. 2d 470, 495-96 (D.N.J. 2004). In exercising the power of remittitur, the Court must "evaluate the evidence presented and determine whether or not the jury has come to a rationally based conclusion." *Spence*, 806 F.2d at 1201; *see also Evans*, 273 F.3d at 354 ("[T]he issue to be decided here 'is not the size of the award alone, but the evidence supporting the award.'" (quoting *Blakey v. Continental Airlines, Inc.*, 992 F. Supp. 731, 737 (D.N.J. 1998)).

Remittitur may be proper where the district court concludes that the evidence was too speculative to support the damages awarded by the jury, *Spence*, 806 F.2d at 1201, or where a damages award "was contrary to all reason and . . . shock[s] the conscience of the court." *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 771-72 (3d Cir. 1987). A jury award shocks the conscience of the court when it bears no rational relationship to the evidence presented at trial. *Id.* at 773. In contemplating a motion for remittitur, the Court must "review a damage award to determine if it is rationally based," *Williams v. Martin Marietta Alumina, Inc.*, 817 F.2d 1030, 1038 (3d Cir. 1987), and issue a remittitur "where it is not." *Blakey*, 992 F. Supp. at 738. "If remittitur is granted, the party against whom it is entered can accept it or can proceed to a new trial on the issue of damages." *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 620 (E.D. Pa. 1998); see also *Blakey*, 992 F. Supp. at 741 ("A district court has the power to grant a new trial conditioned on the plaintiff's refusal to agree to a remittitur.").

With respect to the jury's award of damages on Plaintiff's breach of contract claim, Defendant argues the $500,000 award is excessive because actual damages the jury reasonably could have awarded as to both the CFA and breach of contract claims was $83,859. Defendant's

3

Brief ("Def.'s Br.") at 28-29. Defendant further argues that to the extent the jury included non-economic damages, that finding was improper because the jury did not find a willful and wanton breach of contract and, even if it did, Colorado law caps damages for non-economic loss at $250,000. *Id.* at 29. Finally, Defendant argues Plaintiff's claim under the CFA is predicated upon his contention that Defendant failed to adhere to its obligations under the Deed of Trust and, thus, if the Court grants remittitur on either the CFA or the breach of contract claim, recovery on the second claim should be reduced to $0 to avoid double recovery. *Id.* at 30. Plaintiff, on the other hand, argues that the jury's award of non-economic damages was supported by the testimony of Plaintiff and his wife and Defendant offers no evidence of double recovery other than speculation about the jury's thought process during deliberations. Plaintiff's Brief ("Pl.'s Br.") at 22, 25.

The Court agrees with Plaintiff. Defendant's remittitur argument on the damages award for the breach of contract claim is essentially a request for this Court to speculate about the jury's deliberations with respect to that claim. In the jury instructions, which the Parties jointly submitted to this Court, the Court differentiated between general damages and non-economic losses or injuries. Trial Transcript ("Trial Tr.") at 398:4-399:25; ECF No. 172. The verdict sheet, which was also jointly submitted by the Parties, did not, however, ask the jury to differentiate between general damages and non-economic losses or injuries. (ECF No. 181) Defendant now presents the Court with an after-the-fact request to review the jury's damages award and differentiate between general and non-economic losses or injuries on the jury's behalf through speculation. This is the very practice which the Third Circuit has cautioned against. *See Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1279 n.19 (3d Cir. 1979) ("[I]t is well accepted that a court will not inquire into the calculation methods employed by the jury during its deliberations."). Thus, the Court will not

disturb the jury's award by way of speculative inquiry and, therefore, denies Defendant's request for remittitur on the breach of contract damages. [2]

Next, Defendant argues that it is entitled to remittitur on Plaintiff's CFA claim because the damages were limited to evidence concerning 1) the difference in the unpaid balance of Plaintiff's mortgage loan presently owed compared to the unpaid balance Plaintiff claimed he would have owed if the insurance proceeds had been applied at an earlier time and 2) the replacement cost insurance benefits Plaintiff would have claimed had he timely rebuilt his home. Def.'s Br. at 23-28. Defendant argues Plaintiff's evidence of "loss" was $83,859.02, however, the jury returned a verdict of more than ten times the amount of damages supported by the evidence. *Id.* at 23.

The CFA provides, in relevant part: "Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act . . . may bring an action . . . in any court of competent jurisdiction." N.J.S.A. 56:8-19. In order to maintain a private action to remedy a violation of the CFA, a plaintiff must present a claim of ascertainable loss. *Laufer v. U.S. Life Ins. Co. in City of N.Y.*, 896 A.2d 1101, 1110 (N.J. 2006).

"The CFA does not define what constitutes an 'ascertainable loss,' and there is no legislative history 'that sheds direct light on those words.'" *Barows v. Chase Manhattan Mortg. Corp.*, 465 F. Supp. 2d 347, 361 (D.N.J. 2006) (quoting *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 792 (N.J. 2005)). The New Jersey Supreme Court has determined that "[t]o give effect to the legislative language describing the requisite loss for private standing under the CFA,

---

[2] The Court notes that Defendant submits that Colorado law caps non-economic loss at $250,000. However, contrary to this assertion, Plaintiff has submitted a copy of the Certificate of Jena Griswold, Secretary of State of the State of Colorado that conclusively establishes that in 2023 the cap on non-economic damages under Colorado law is $613,760. (Pl.'s Br. at 22, Ex. 1) The Certification further supports the Court's decision not to disturb the jury's findings on damages under the breach of contract claim.

. . . a private plaintiff must produce evidence from which a factfinder could find or infer that the plaintiff suffered an actual loss.'" *Id.* "'The certainty implicit in the concept of an 'ascertainable' loss is that it is quantifiable or measurable,' and in order to raise a genuine dispute, 'the plaintiff must proffer evidence of loss that is not hypothetical or illusory.'" *Id.* (quoting *Thiedemann*, 872 A.2d at 792). "In cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." *Thiedemann*, 872 A.2d at 792.

The New Jersey Supreme Court has explained the three main purposes of the CFA are: 1) "to punish the wrongdoer through an award of treble damages[;]" 2) "by way of the counsel fee provision, to attract competent counsel to counteract the community scourge of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual[;]" and 3) to compensate victims for actual losses. *Lettenmaier v. Lube Connection, Inc.*, 741 A.2d 591, 593-94 (N.J. 1999). Accordingly, "the treble damages award provides a substantial punitive component which permissively compensates beyond the amount of actual harm." *Leff v. First Horizon Home Loan*, No. 05-3648, 2007 WL 2572362, *3 (D.N.J. Sept. 4, 2007).

Here, the jury was presented with evidence that Plaintiff lost $167,601.85,[3] which includes 1) the $83,736.17 Plaintiff spent from the first draw of his insurance proceeds to rebuild his home, which were expenses covered under his insurance policy; 2) the $30,006.66 difference between the balance provided on an amortization table of Plaintiff's mortgage loan in October 2017, when Defendant denied Plaintiff a second draw from his insurance proceeds, and the payoff amount on

---

[3] When this amount is trebled, the total amount of damages awarded pursuant to the CFA is $502,805.55.

6

Plaintiff's mortgage loan in September 2020 after Defendant applied Plaintiff's insurance proceeds to the loan; and 3) $53,859.02 in extended replacement cost insurance benefits.

First, the jury was presented with evidence that Plaintiff received from Ocwen Loan Servicing LLC ("Ocwen"), Plaintiff's mortgage loan servicer before Defendant took over Plaintiff's mortgage loan, an initial draw of $94,977.25 from the $283,475.78 in insurance proceeds for the rebuild of his home, which Plaintiff spent on removal of debris, excavation, work on the septic system, driveway, fence, and barn. Plaintiff's Trial Exhibit ("Pl.'s Trial Ex.") 3; Defendant's Trial Exhibit ("Def.'s Trial Ex.") 13; Trial Transcript ("Trial Tr.") 293:22-295:3. Pursuant to the home insurance policy Plaintiff had with Farmers Insurance Exchange ("Farmers") for the property where the fire occurred, the following items were covered under Plaintiff's policy and accounted for in Farmers' adjustor's worksheet, which outlined the valuation of expenses required for the rebuild: demolition and debris removal, interior finish, floor covering, heating/AC, plumbing, electrical, windows, exterior finish, rough framing, foundation, auxiliary structures, and labor. Pl.'s Trial Ex. 3. Farmers provided a valuation for each of the above referenced items.[4] *Id.* Its valuations with respect to demolition and debris removal, foundation, and auxiliary structures,[5] were $13,402.94; $67,103.33, and $3,229.90 respectively, totaling $83,736.17. *Id.*

During trial, Plaintiff testified he spent the first draw of funds on the removal of debris, excavation, work on the septic system, driveway, fencing, installing gates, and renovating his barn. Trial Tr. 293:22-295:3; 328:3-331:21. He explained the first round of construction involved a

---

[4] The Court notes Farmers provides two valuations for each category of expenses needed for the rebuild: a replacement cost value ("RCV") and an actual cash value ("ACV"). Pl.'s Trial Ex. 3. Farmers identified the $283,475.78 amount that was ultimately issued to Ocwen and Plaintiff in the form of a check, representing the insurance proceeds for the rebuild, as ACV. Accordingly, the Court uses the ACV amounts identified by Farmers for each of the expenses discussed in this Memorandum Opinion and Order. Pl.'s Trial Exs. 3, 4.

[5] The "auxiliary structure" was specified in Farmers' estimate as the "driveway." Pl.'s Trial Ex. 3.

teardown and removal of debris from the bottom of the basement foundation, excavation, and putting up the foundation wall. Trial Tr. 293:22-294:6.

Notably, fencing, gates, and renovation to the barn were not items explicitly identified in Farmers' valuation for the rebuild and Plaintiff admitted to as much during trial. Pl.'s Trial Ex. 3; Trial Tr. 328:3-331:21. During trial, Plaintiff provided some estimates but did not specify exactly how much he spent on the fencing, gates, or barn. Trial Tr. at 344:12-345:6. However, as Farmers' valuations for debris removal, foundation, and auxilliary structures totaled $83,736.17, and Plaintiff received $94,977.25 as the first draw of insurance proceeds, the evidence supports a finding that Plaintiff spent at least $11,241.08 on the fence, gate, and barn work. As Plaintiff was only able to complete removal of the debris and excavation and foundation work and was subsequently denied additional draws from the insurance proceeds – thus, unable to complete the rebuild of his home – the Court finds that the jury was presented with enough evidence that showed Plaintiff lost $83,736.17, over half of the first draw from the insurance proceeds. The Court deducts $11,241.08 from the first draw of insurance proceeds Plaintiff received to represent the funds Plaintiff spent on the fence, gate, and barn work not explicitly accounted for in Farmers' valuation for the rebuild. Accordingly, the Court concludes $83,736.17 is part of Plaintiff's ascertainable loss on his CFA claim.

Second, several documents regarding Plaintiff's mortgage loan were admitted into evidence during trial, including an amortization schedule of Plaintiff's loan dated December 2017, a payoff statement for Plaintiff's mortgage loan dated October 2020, and a payment history for Plaintiff's loan stating the loan balance as of October 2017. Pl.'s Trial Exs. 22, 23; Def.'s Trial Ex. 17B. During trial, testimony from a corporate designee of Defendant further explained the nature of these documents. Trial Tr. at 161:4-164:3. The evidence in the record reflects that had

8

Defendant applied $188,498.53,[6] in October 2017[7] to Plaintiff's mortgage loan balance which, at the time, was $261,027.93, the balance on the loan would have been $72,529.40. Pl.'s Trial Ex. 22; Trial Tr. at 161:4-19. Instead, Defendant applied the insurance proceeds to Plaintiff's mortgage loan in September 2020, making the payoff amount on the loan $102,536.06. Pl.'s Tr. Exs. at 8, 22, 23. Thus, evidence was presented to the jury which would support the finding that had Defendant paid the balance of Plaintiff's mortgage loan with insurance proceeds in October 2017 instead of in September 2020, Plaintiff would have been charged $30,006.66 less. Accordingly, the Court concludes $30,006.66 is part of Plaintiff's ascertainable loss on his CFA claim.

Finally, the jury was presented with documents and testimony related to insurance proceeds Plaintiff received from Farmers. Pl.'s Trial Exs. 3, 4; Def.'s Trial Ex. 13. The evidence indicates a check for $283,475.78 was issued in May 2015 to Plaintiff and Ocwen so that Plaintiff could rebuild his home. Pl's Tr. Exs. 3, 4. The check was made out to both Plaintiff and Ocwen with the understanding that Ocwen would hold the funds and disburse them to Plaintiff in increments for the home rebuild. Pl.'s Trial Ex. 3; Trial Tr. at 287:6-9. As previously discussed, Farmers also issued an adjustor's worksheet, which outlined Farmers' valuation of the various costs needed to rebuild Plaintiff's home. Pl.'s Trial Ex. 3. The worksheet stated the actual cash value ("ACV") was $283,475.78 to rebuild Plaintiff's home.[8] *Id.* The adjustor's worksheet also listed an extended replacement cost of $53,859.02, which meant that if Plaintiff had used the full $283,475.78 amount

---

[6] For purposes of clarity, the Court notes the $188,498.53 was the remainder of insurance proceeds available to Plaintiff after his initial draw of $94,977.25.

[7] In October 2017, Defendant denied Plaintiff the second draw from the insurance proceeds, citing the need for a letter of intent. Trial Tr. 144:14-145:2.

[8] The Court notes the adjustor's worksheet listed $284,975.78 as the ACV to rebuild Plaintiff's home but a $1,500.00 deductible was subtracted from that amount. Pl.'s Trial Ex. 3.

9

to rebuild the home, but had not completed repairs using those funds, $53,859.02 would have been available to Plaintiff to complete the rebuild. Pl.'s Trial Ex. 3; Trial Tr. at 290:18-24.

Moreover, during trial, Plaintiff testified that the rebuild of his home would have cost $370,000. Trial Tr. at 322:5-12. That amount was memorialized in a contract between Plaintiff and his construction company, which Plaintiff admitted during trial was a company he owned. Pl.'s Trial Ex. 4; Trial Tr. at 322:5-11. Plaintiff had also submitted documents to Ocwen in July 2015 memorializing the $370,000. *Id.* Thus, before the loan had even been transferred to Freedom in November 2015, the repairs were estimated to cost $370,000, well over the $283,475.78 amount of insurance proceeds Farmers had issued for the home rebuild. Trial Tr. at 30:7-8; Pl.'s Trial Ex. 4. Accordingly, the evidence in the record suggests that Plaintiff would have eventually needed to apply for and use the extended replacement funds available to him. Accordingly, the Court concludes $53,859.02 is part of Plaintiff's ascertainable loss on his CFA claim.

Thus, the Court finds that the $1,000,000 damages awarded by the jury "shocks the conscience of the court" and bears no rational relationship to the evidence presented at trial. The total amount of ascertainable loss supported by the record evidence is $167,601.85. That amount represents the sum of money and property Plaintiff lost as a result of Defendant's CFA violation, including: 1) the $83,736.17 Plaintiff spent from the first draw of insurance proceeds to rebuild his home, which were expenses covered under his insurance policy; 2) the $30,006.66 difference between the balance provided on an amortization table of Plaintiff's mortgage loan in October 2017, when Defendant denied Plaintiff a second draw from his insurance proceeds, and the payoff amount on Plaintiff's mortgage loan in September 2020 after Defendant applied Plaintiff's insurance proceeds to the loan; and 3) $53,859.02 in extended replacement cost insurance benefits. Accordingly, the Court remits the $1,000,000 the jury awarded Plaintiff pursuant to the CFA to

$167,601.85. Thus, in granting Plaintiff's request for trebled damages, the total amount awarded to Plaintiff on his CFA claim is $502,805.55.

/s/ Karen M. Williams<br>
KAREN M. WILLIAMS<br>
United States District Judge

Dated: May 17, 2024